matter under advisement and we'll call our next case, which is Haberle v. Troxell. Mr. Walsh. May it please the court, my name is Joseph Walsh and I'm here representing the appellant, Nicole Haberle. I would like to reserve four minutes for rebuttal. Done. This appeal presents three separate issues. Two constitutional issues which are mutually exclusive and then an issue with respect to the applicability of the Americans with Disabilities Act. So let me ask you about the ADA violation. Is your claim best described as focusing on exclusion, denial of benefits, or the discriminatory act? We're focusing on the denial of a reasonable accommodation of a program or service of the borough of Nazareth. So, and you're focusing on shore for that because I presume that like shore, or shore's analysis that the regulation that was at issue there created this notion that the police should have a program and series in place when they're doing warrants in those kinds of situations. That's correct. That's what shore says. You're relying on shore. But also, we're relying upon the trend of the out-of-circuit cases. Our view of the history of these out-of-circuit cases are that Haynes was kind of the high watermark for the notion that there's an absolute ban, that there's a line you can't cross with the ADA. We believe that the more recent circuit decisions have softened that line and made it more a focus on the reasonableness of the specific regulation here. They had a warrant, obviously, but what's the specific accommodation that the Nazareth should have engaged in? Because obviously this is your failure to train appropriately. That's correct. That's an aspect of it. It's also failure to adopt the policy, to review the policies as required by the regs under the ADA to make accommodations for dealing with mentally disturbed individuals. Doesn't all that have to be tied to an actual violation of the ADA? I mean, you can't have a free-floating failure to train claim. It has to be tied to some deprivation, right? Okay, so what's the deprivation? The deprivation is that he was deprived of the benefits of the service that was being rendered by the borough as a result of their failure to accommodate mentally disturbed individuals. But you say it's a reasonable accommodation. So we look at the failure to train, you allege, then we look at what happened at the scene. And at the scene, the officer, now here's an issue. Is it conceded that he knew that Nixon was in there with a gun with other people? It is conceded that he knew that Nixon was mentally disturbed and that he had stolen a gun and that he was in that apartment. Which was not his apartment. Which was not his apartment. But we don't know that he knew that it was the brother-in-law or whoever and the child. At this stage, not having done discovery, we do not know that. But we do know what he did. He knocked on the door and announced police. Well, no, we don't know that, right? Presumably. So you allege presumably, which I'm confused That is the police view of our facts. We do not view them that way and that's not what we presented to the court. But we presented to the court It's what you allege, right? It's in your brief. But it's more than knocking on the door. And this is the issue of deciding this under a 12B6 standard. What we also allege was that multiple officers from multiple other departments appeared on the scene and suggested the reasonable course of action, which was to call in the trained professionals of the Pennsylvania State Police. What does, help me understand, I've read your materials and I'm having a little trouble understanding what that has to do with anything that you can point to that says they deprived your client, excuse me, the decedent of some benefit that the decedent was entitled to. In fact, let me put it to you this way. You say in paragraph 34 of your minute complaint, and I quote, the other officers suggested that an attempt to communicate to Timothy be made. Then now the further defendant, Troxell, refused to communicate with Timothy. But I thought that, in fact, your assertion about the seed of all that was bad here, the tragic circumstances, is that Troxell did attempt to communicate. He knocked on the door and said police. And that's what prompted Mr. Nixon to take his own life. So even by the way you framed the complaint, you seem to be saying, Troxell, he refused to communicate, but your allegation is he communicated and that's the problem. So I'm trying to suss out what it is you're pointing to to say that was it, that was the ADA violation at the scene. The ADA violation was Troxell taking upon himself to actually physically attempt to communicate with the people in the apartment prior to the... This isn't like Smith where people are going into the apartment, right? This is a knock at the door, and I'm still confused about why presumably he's there. You either allege he did or he didn't, right? Because we're on a motion to dismiss now. He did? No, we can't ascertain that prior to discovery. Okay, so then the only thing that we can take into account is... It's in the complaint, correct? Yes, we said that presumably he identified himself as a police officer. Well, we'll take that, I mean, we'll presume it's true. Wouldn't any, in any permutation of possible situations, whether it's a trained negotiator, a police officer who was trained with all of the regulations that you would hope for, wouldn't at some point there be either a knock or a phone call, an identification of a negotiator or anyone else as being with law enforcement? There would be an attempt to communicate by someone trained in communications under these kinds of situations with a mentally disturbed individual. What we're trying to get you to help us with is, you're saying, explain how things would have been different. If Mr. Troxel, what's your view of the world that would have been different had it been Bob Smith, trained negotiator, knocking on the door saying, Bob Smith, police, trained negotiator? In one way, I do not believe the trained negotiator would start by physically attempting to enter the apartment. I think they would attempt to establish communications by telephone or some other method. How are we supposed to know on the basis of what you've provided us that that's some kind of a, I mean, it feels like we've entered the realm of pure speculation here. But how is it that it's not just purely speculative that knocking and announcing is somehow contrary to the ordinary way you establish communication? If you're a trained person or you're not a trained person, if you've got a suicidal person or a not suicidal person, you're making contact. In fact, your complaint says he wouldn't contact. So he does contact and you say that's the problem. I mean, which is it? Is it that he wouldn't contact or is it that he did contact? Or is it both? The problem is the manner of the contact. Because knocking and announcing is an ADA violation. No, because knocking and announcing without any guidance whatsoever from the municipality as to how you should do this in the context of a mentally disturbed individual is the ADA violation. Well, you talk about the trend of the cases. The trend of the cases is to say, okay, the ADA applies. But we're talking about a reasonableness here, reasonable accommodation. And we have this interplay of police conduct and the disability statute. And we found the disability ADA applies by its terms. I'm not sure quite how it applies because the police have these other considerations. They have situation where they know there is a man in an apartment that is not his own and he probably has a gun. And what's a police officer to do? Are we requiring him at that point to say, oh, but guess what? I better not secure this scene because, you know, I need to do other things. The case law, the trend of the case law is to allow the police in that situation where there is an exigency to secure the scene. Why should we not apply that here? Why should we make the police in this situation where there's a gun? If there weren't a gun, it might be different. But there's a gun and he's in a place that's not his own. That creates in the mind of the police, at least arguably, a need to secure the scene. Why should we not follow that trend of the case law? Officer Troxell himself did not treat this as exigent circumstances. He, in fact, took three hours to respond to that apartment. You've got to face Waller, right? Waller is a case cited by the district court. Waller is exactly on point on that. And the court there says exigency is not confined to split-second circumstances. There were two, three hours involved in that circumstance. And the court basically says what Judge Rendell just did. This is an armed person in an apartment with other people. That's a dangerous thing. And the Fourth Circuit seems to be saying, you know, this is a very interesting debate. Does the ADA apply or not apply? But we don't have to answer that question because we know this, whether it applies or not. Even if it did apply, it would not be reasonable to say, it wouldn't be a reasonable accommodation to put the police to the task of figuring out, what are my ADA responsibilities here now? There's an armed and potentially dangerous person in there. Now, that's the holding in Waller and the specific rejection of your position. Why is Waller wrong? Why is the Fourth Circuit going to work? Well, Waller, as most of these out-of-circuit cases are, are similar judgment issues where you've got a fully developed factual record. What would be different? Assume, what is it that we're not assuming? I know you've taken issue with some of the things that the district court said, but what is it different that we should be looking at? Here we assume, as you've alleged, that Officer Troxell goes to the door and knocks and announces. And then Mr. Nixon, tragically, very sadly, seriously disturbed, takes his own life. What are we supposed to assume in there that is in your favor that would change that? As we have alleged in our complaint, the conduct that occurred here, we believe, to be beneath the nationally recognized standards for law enforcement agencies. And in discovery, we intended to present expert testimony in that regard, which we believe would inform the decision about reasonableness. Take it to the next step. What is this perfect scenario that you would hope for? Troxell acted singly, right? He was just one individual at the door. Obviously, other officers in the area courted off and so forth. But just one officer at the door, right? That's correct. That's your allegation? That's correct. So in this Nirvana-like situation, what is it that we should be saying in an opinion that was wrong? Well, I don't believe that the interactions between Pennsylvania State Police and a mentally disturbed person are anywhere near Nirvana, but they would be more aware of matters that they should take into consideration that were not taken into consideration by Officer Troxell when he gives that epithet to the other legitimate law enforcement people. That epithet has nothing to do with anything. You know, we've all read it. It's disgusting, but it really has nothing to do with this, right? He can say anything he wanted to in that context. But if three hours later, and I happen to think that the dissipation of time doesn't necessarily in order your benefit, right? The one thing you're ignoring here is that police officers are supposed to secure the scene. Had he not secured the scene, he would have been faulted for that, for setting up a perimeter when he should have secured the scene. So he's got kind of a Hobson's choice, and the reasonableness piece, again, I say it's the interplay of these different duties of a police officer. It's tough for us, I think, to say that, you know, that he needs to prefer the possible ADA choice as compared to the other training he's received to secure the scene when something's dangerous. How do you respond to that? Well, we're alleging that the possible ADA choice is, in fact, what the national standards are for law enforcement. Which is what? Which is what? That's what I keep coming back to, Mr. Wilson, trying to get you to say, what is it that Troxell should have done or should not have done? Because the only thing you keep saying is, there should have been training. But not in your briefing and not here today have you given us any indication what should or shouldn't have been different. What specifically can you point to to say, that was wrong? Before you ever get to the training, you need to have the regulation to train the officer on. And that's where we, consistently sure, say the violation of the ADA occurs. Okay, so your argument really is the sure argument. It's the argument that a failure to train, regardless of whether you can point to anything that you could say that was wrong, the failure to train itself is an ADA violation giving rise to liability. Just to be clear, Your Honor, what was wrong was Officer Troxell, with no training in this area, taking it upon himself to go to the department, as opposed to having the trained professionals, the Pennsylvania State Police. That's what was wrong. You know, part of the reason that I have a problem with you relying on short is, there's a clear exigency there. There's a confrontation in a way that, you know, can lead to split-second decisions, bad choices, you know, Hames as well. Here, he's in an apartment, nobody knows, you know, the circumstances, nobody knows hostages, anything, right? And, you know, nobody's trying to break down the door, nobody's bringing in, there's just one person at the door. If there's nothing other than the fact that there are no regulations in place, that's the entirety of your claim, right? It's not like, sure, it's the actions, it's really just the fact that there is no regulation. Well, but it's more than just knocking on the door, and this is our concern about how the district court read the complaint. It is rejecting the standard law enforcement procedures under a situation such as was presented here. When you say it's rejecting, so now you've gone back in time again, right? Temporarily, we were at the door with Judge Greenaway's question, but you go back in time and say the rejecting of national standards. You're saying the borough failed to train, the borough failed to adopt, the borough failed to do these things in advance. I'm pushing you on it because I want to make sure I understand, Mr. Welsh. You still have not said that he did anything incorrect without pointing to and saying he should have had national standards in mind and understood them and been trained on them. That's the seed of your complaint, right? And accepted the advice of the other law enforcement officials there. Okay, what should have been done, right? Okay, we got it. I think I have it. Your argument is the regulation is not in place, that's the violation. Is there anything that he should have done that day? Should he never have been at the door? Should there never have been contact? What is it that should have happened? Obviously when I said Nirvana, I didn't mean beautiful flowers in the sky. I meant in your best case scenario. They would have contacted the Pennsylvania State Police that would have taken appropriate steps consistent with their training. What is the appropriate step? The appropriate steps would have been to make contact with people inside the apartment, not physically present, but to make contact by telephone to enlist. Okay, so if the same tragedy happened but there had been a phone call to the apartment rather than a knock at the door, you'd have no claim. That's correct. And there are cases out of circuit that we've made some district court cases where there are attempts made to have someone trained in hostage negotiation come in and talk. So your ADA claim is the only way to deal with a potential dangerous situation is to have a designated negotiation team, a trained negotiating person, make the contact. Or to utilize those resources from another law enforcement agency. So once again, it is the training. It's not what happened or didn't happen at the door, or it's not what happened or didn't happen on the scene. It is lack of regulation, lack of training in advance. It is the decisions that Officer Troxell made in the absence of any policies to inform him as to how that would occur. I mean, if there was somebody from the Pennsylvania State Police at the scene and Troxell said, this is what I'm going to do, and that person said, go ahead, you'd have no claim. That's correct. Okay, understood. Thank you very much, Mr. Welsh. Thank you, Your Honor. Mr. Morgenstern. May it please the Court. My name is John Morgenstern from D.C. Mahoney, Valentina, and I represent the Appalese, the municipal defendants below. The appellant's claim, as far as the ADA goes, fails for at least three reasons. First, it's questionable, if not highly doubtful, whether Mr. Nixon's own arrest would constitute the type of service, program, or activity. There was no arrest, right? There was no arrest, Your Honor. Okay. So I guess the first question is, you know, what was the program or activity for which this individual was denied an opportunity, and what would I, the benefit of? What I hear Mr. Welsh saying, what you need to respond to, is the world would have been different had there been appropriate training, because there would not have been the kind of approach there was. That's the nature of the ADA violation. What is the error in that reasoning? Well, Your Honor, from the officer's perspective, keeping in mind that when Ms. Haberly contacted the police, she did not contact a mental health service agency. She did not contact a suicide hotline. She called the police to report that Mr. Nixon had taken a gun. But it's admitted that he knew that Nixon was disabled, right? Based upon the complaint, Your Honor, what we know is that Mr. Nixon had taken a gun. He entered, he broke into a friend's apartment, took a gun that did not belong to him. And Tromso knew he was disabled. He had a warrant for his arrest. Did he know he was disabled? The question that Judge Jordan poses, what was he denied? Was he not denied of the benefit of proper police training, which had he received that, at the scene Tromso would have done something different, and ergo Nixon, the theory is, would not have reacted the way he did. So what's wrong with that? Well, there are two things. And there are two different analyses that we would have to conduct. We've got the constitutional claims. So typically you would have a claim against police officers. I'm talking about the ADA. Right. So here we're talking about training that would require directly affording the benefits of these services, programs, and activities to an individual under the ADA. You have training for officers going to serve a warrant, right? You have training for that, right? Yes, sir. So the point is, officer serves a warrant, but if there is someone who is mentally disabled or challenged, there's a set of rules. What's the matter with that? Both logically and procedurally, that would seem to make sense. Absolutely, Your Honor. And sticking to the complaint under a 12B6 analysis, there's no allegation that an officer had received specific training. Well, all the more reason should we let it go to summary judgment. So we understand that when there is this interplay between the obligation to secure the scene, but then you know it's a disability and you have other requirements, and we know better which one trumps the other and what he should have done in this situation. Why should we not let it go to discovery and understand better what the training was with respect to these situations? Well, Your Honor, that's not necessary in this case. Why not? Because by reasonable implication, based upon the complaint, Officer Troxell was a police officer in Pennsylvania. In order to become a police officer in Pennsylvania, you need to receive Act 120 certifications to have an OPEC card to work as a police officer. You're not making sense. What do you mean? The core curriculum of Act 120 involves training specific to dealing with people with special needs, suicidal people. Wait, wait, wait. You're saying he had the training. He had the training. Wait, wait. Is that part of the complaint? On a 12B6, how would we know that? By reasonable implication, he is alleged to be a police officer in Pennsylvania. How would we know that on a 12B6? Well, in order to be a police officer in Pennsylvania, you have to have an Act 120 training. More to the point, you're dodging what you ought to square up to, it seems to me, Mr. Warren Stern, which is one of the primary arguments made by your opponent, that the district court failed to take the facts in the light most favorable to your client. Now you're asking us to draw inferences in your client's favor. So let's stick to the complaint, where we're supposed to be in 12B6 land, and draw all reasonable inferences in favor of Mr. Welsh's client instead of in favor of yours, and ask, the assertion, the allegation is, there would have been different training. That would have produced a different outcome. That's what you've got to face. If you want to go back and say, hey, you know what, we confess the district court made errors, send it back, we'll prove all this stuff about the training that they actually had, etc. I guess we could wrap this up right now. But face us now on the procedural ground we're on, and please respond to Judge Rendell's question, which I take it to be, why should we reject the plaintiff's assertion that had there been training, things would have unfolded differently, therefore the failure to train constitutes an ADA violation. Take that argument on if you would. Absolutely, Your Honor. And there was no causation between any lack of training, in this case, under the ADA, specific to providing benefits afforded under Title II of the ADA, and what happened in this case, because it never got to that point. All that this officer did was knock on the door. But how do we know that that's what he should have done in that situation? Because, Your Honor, an officer in any situation, especially one where a gun is alleged and an arrest warrant is in the officer's hand... Where he knows there's a disabled person inside. Even with a disabled person, the officer still must first... And we know that categorically, that he's got to knock and announce police. That's your... The officer must first secure the scene, by whatever means. Setting up a perimeter is one thing. Containing the danger is all that would accomplish. However, in this case, securing the scene had to be done... Suppose we let the case go through to summary judgment, and in discovery, someone from the Pennsylvania State Police was on the stand, and they were asked a series of questions about what specific training one gets in this area, what specific training should be done, etc. And as a result of that, the officers, or whomever was testifying, said, You know, in these kinds of situations, we would never knock on the door. And we would never announce ourselves. We would instead try to contact whoever's inside by telephone, or we'd wait it out, or any number of permutations of actions, other than knocking on the door and announcing police. We can never get to that point, because right now, all you're saying is it was within regulations, but we don't know whether it was within regulations as it applies to this specific set of circumstances. And we do have cases, sure, among others, which, you know, admittedly more dire consequences, but there are regulations that control them. So why shouldn't we give the plaintiff the opportunity? Well, beginning with the Shore case, your Honor, that case involved a 302 call to a mental health agency. It was where the police were trying to pick up a mentally ill individual to take him for treatment. In this case, Officer Troxell was there to pick up Mr. Nixon on an arrest warrant for a felony. What's the difference between a 302 warrant, I'm pretty sure it was 302, and an arrest warrant? For purposes of our discussion in a 12B6 context. Well, in the context of a 12B6 context, the officer had to secure the scene. The warrant was to pick up somebody. That's my point. Whether it was a 302 pickup or a warrant for an arrest for a felony, he still needed to secure the scene first. That needed to be done no matter what. Are you conceding then that the ADA applies? Because I suppose one answer to Judge Greenway's question might be an arrest warrant is something that the ADA doesn't apply to. Some courts have taken that position, and that's different than securing somebody to take them to a mental health facility. But that's only if you abide the notion that the ADA doesn't apply to an arrest. Does the ADA apply to an arrest or not? And does it matter in this case? Because maybe we end up right where you were, which is 302 arrest, felony arrest, it's an arrest. Your Honor, the ADA does apply to arrests upon a triggering event. Once the scene is secure, then the ADA will apply. If Mr. Nixon had been taken into custody, or if anyone is taken into custody after a scene is secure, and they ask for medical treatment, or they exhibit a need for mental health treatment, absolutely, at that point, the ADA would apply. But you're saying the ADA categorically does not apply to police activity associated with investigation, enforcement, securing a scene, that the ADA just doesn't apply for that? It does not apply until a scene is secure. Okay. Other than Haynes, what do you have? Because you've heard Mr. Welsh argue that the trend is clearly away from that, that the arguments in the circuit courts and the district courts now are essentially the accommodation sought is unreasonable, which presumes the applicability of the ADA, not that the ADA categorically is inapplicable. Your Honor, I would disagree that the trend is away from the Haynes case. What case later than Haynes do you have? Your opponents cite Brickell, there's Waller, which is a pretty darn good case for you, but even there, the Fourth Circuit, whose Rosen predated Haynes, the Fourth Circuit itself seems to have walked away from the idea of a category that doesn't apply and says, you know, well, maybe it applies, but it doesn't matter because it wouldn't be reasonable here. So what do you have post-Haynes that says, hey, ADA just has no place here? Your Honor, there are cases from the First, Fourth, Sixth, and Eighth Circuits that are consistent with Haynes, and that being the general rule of law that the police officers must first secure the scene before accommodating a disability under the ADA. How do you define securing the scene? We know, I'm not sure the police knew, five people are in the apartment. There's a person with a gun in the apartment, police believe. One person is sent to the door. What's required to secure the scene? Your Honor, every arrest will have a moment when the scene becomes secure. It's an identifiable event that will mark the moment at which the ADA would apply. That can be when a suspect is placed in handcuffs. That can be when a weapon, a reported weapon is found. But if there is a methodology, if you have a disabled person, as to how you should get him into handcuffs, doesn't that implicate how you need to go about securing the scene? Officers cannot, officers making discretionary split-second decisions cannot accommodate a... Well, maybe we get expert testimony about that on summary judgment as to what's supposed to happen when. But that really is not necessary, Your Honor, because... Well, you know, I'm so sorry to interrupt. You know before he knocks on the door that you have somebody who's mentally disturbed inside. So Judge Rendell's question is, you know that. Maybe regulations inform your approach to the door. You'd have to concede that. Well, I would ask, Your Honor, I believe that it would be bad law if we looked only at an officer's knowledge that a person had a mental problem. It would be no surprise that most people committing crimes have mental problems. Most people, you know, for whom there's an arrest warrant, is not going to be free of some... Look at what you have that day. Look at what you have that day, right? That day, you have suicidal tendencies, broke into a friend's house to get a gun, right? Is that another place, not his own, right? I mean, I'm not going to concede that most people who commit crimes have mental problems. Let's put that aside and let's assume you didn't say that. Yes, sir. Just deal with those set of circumstances, right? I mean, you'd have to concede that given those facts, right, if there were regulation in place, you might act differently, right, than without that information. After the gun is secured, after the scene is secured, then the... And you're saying how you go about securing the scene with a disabled person is just a matter of knocking and announcing and going in. It sounds like what you're saying is it doesn't matter who's in there. If there's a gun, that's that. There's no training that would assist you in making sure that you safely secured the scene. You just do what you're going to do. Battling rams, SWAT team, rappelling down the side of the building, doesn't matter. You're going to do what you're going to do because there's a gun. That's the argument, right? And the training that every officer would receive in order to become a police officer is what applies at that point. How to secure a scene, how to take someone into custody. That should be no different for a disabled person as a non-disabled person unless and until... Well, I guess that's the question, right? That is the question. When you say it should be no different, they're saying it should be different. The legislative history of the ADA tells us there should be circumstances and can be circumstances where training would make a difference. The Act itself speaks in broad language. So when you say there's no difference, you know, kind of looking for something that you can hang your hat on there other than assertion. But before we have you sit down, you said there were three circuits that had post-Haynes decisions that said that the ADA categorically does not apply in arrest situations. That's what I understood you to say. Maybe I misunderstood you. If you've got post-Haynes decisions that say the ADA categorically does not apply in arrest situations, I would like to know them. Yes, sir. And they do not say categorically that the ADA does not apply to arrest situations. It says that the ADA does not apply until the scene is secure. Okay. What case is this? I'm looking at the First Circuit cases, Buchanan v. Maine. Pardon? Buchanan. Cited in our briefs, I believe this is the First Circuit, 469 F3rd, page 158 at 176. I'm so sorry. Please say that again. Buchanan v. Maine is 469 F3rd, 158 at page 176. Okay. And specifically, look at note 13 on that page. Next circuit. I look at the Sixth Circuit case of Tucker v. Tennessee, 539 F3rd, 526 at 534. The Eighth Circuit, I look at Du Bois v. Taser International. This is 760 F3rd, 892 at page 897. Okay. And we go and look at these places. They're going to say ADA, as a categorical matter, does not apply until the point where an officer has secured a scene. That's what we're going to find. I believe, Your Honor, they stand for the same general propositions that officers may secure a scene. Without thinking about the ADA. Well, before thinking about the ADA, yeah. Okay. Thank you very much, Mr. Morgenstern. Mr. Welsh, we'll have you back on rebuttal now. Oops. Thank you. I'm sure you have a lot to say, but Mr. Welsh, are you familiar with any of the cases that were decided? Yes, Your Honor. In fact, that was the one and only issue that I wanted to address on rebuttal. Well, then have it. I'll try to do that in under four minutes. My recollection, just looking at my notes, is that I don't believe Buchanan, the First Circuit case, involved police on the scene. I just have that note here, and frankly, I'm drawing a blank on exactly what the fact pattern was. Have a look at it. But in any event, Tucker, the Sixth Circuit case, very specifically reserved the issue of whether an arrest was categorically not covered by the ADA. And my final point would be that if you read the most recent circuit case decision, the one which last year was going to be the vehicle for the Supreme Court to decide this issue, but then that didn't happen, the Sheehan case out of the Ninth Circuit, Sheehan specifically says that today we join the majority of circuits and hold that the ADA applies to arrests. That's all I have, Your Honors. I have nothing further. All right. Thank you, counsel, for argument this morning. It's been helpful. As has been the briefing.  Thank you. Please rise. The Supreme Court stands adjourned until Tuesday, November 8th at 10 a.m.